UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOSEPH HARRISON and STEPHEN
MAZZA,

                    Plaintiffs,

            v.

LOCAL ONE, INTERNATIONAL UNION
OF ELEVATOR CONSTRUCTORS OF
NEW YORK AND NEW JERSEY, AFL-
CIO, LEONARD LEGOTTE, *in his
individual and official capacity as President-
Business Manager of Local One,
International Union of Elevator Constructors
of New York and New Jersey, AFL-CIO*, and
INTERNATIONAL UNION OF
ELEVATOR CONSTRUCTORS,

                    Defendants.

**MEMORANDUM & ORDER**
24-CV-08619 (HG)

**HECTOR GONZALEZ**, United States District Judge:

This is an intra-union dispute.  Plaintiffs Joseph Harrison and Stephen Mazza sued the

International Union of Elevator Constructors ("the International"), a national labor organization;

Local One, a local labor organization within the International; and Leonard Legotte, Local One's

President-Business Manager (together with Local One, the "Local One Defendants").  ECF No. 6

¶¶ 6–8 (Am. Compl.; "AC").  Harrison is a former Local One Vice President and Business Agent

who was "stripped of his membership" in Local One in May 2024, and Mazza is an elected Vice

President and Business Agent for Local One.  *Id.* ¶¶ 4–5.[1]  In this case, they primarily allege

violations of the Labor Management Reporting and Disclosure Act ("LMRDA"), a statute

"enacted to encourage democratic self-governance in unions and to curb widespread abuses and

---

[1]      Although Harrison alleges that he lost his membership in June 2024, AC ¶ 4, his
allegations make clear that his expulsion was confirmed in May 2024, *id.* ¶ 36.

corruption among union leadership." *Maddalone v. Loc. 17, United Bhd. of Carpenters & Joiners of Am.*, 152 F.3d 178, 183 (2d Cir. 1998).[2]  Plaintiffs have moved for a preliminary injunction requiring Defendants, *inter alia*, to re-admit Harrison to the union and to return Mazza to his former position in the union, in advance of upcoming Local One elections.  *See* ECF No. 25 at 2 (Prelim. Inj. Mot.).  At Plaintiffs' request, *see* ECF No. 26 at 1, the Court has resolved the motion on an expedited basis.  For the reasons provided below, their motion for a preliminary injunction is DENIED.

## BACKGROUND

### A.  Harrison, the April 2023 Conference, and Its Aftermath

Harrison was a member of Local One since 1998. *Id.* ¶ 9.[3]  In 2022, he was elected as a Local One Vice President, a role in which he served as a Business Agent representing employees on Long Island and Staten Island.  *Id.*  For three days in late April 2023, he attended the National Building Trades Legislative Conference in Washington, D.C.  *Id.* ¶ 12.  While there, he says he "became intoxicated during certain social events" following conference meetings, and at one

---

[2]    Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

[3]    The Court cites the allegations in the AC to frame the present motion but does not accept them as true.  *See Stewart v. MTA*, 566 F. Supp. 3d 197, 213 (E.D.N.Y. 2019) ("Unlike a motion to dismiss, which considers exclusively the nonconclusory facts alleged in the Complaint and assumes them to be true, to obtain preliminary injunctive relief Plaintiffs must clear a much higher hurdle.").  Nevertheless, where, as here, "the pleadings are properly verified, they may serve the office both of pleadings and evidence on an application for a temporary injunction." *See Ptak Bros. Jewelry, Inc. v. Ptak*, No. 06-cv-13732, 2007 WL 1536934, at *1 n.2 (S.D.N.Y. May 29, 2007) (Chin, J.).  One wrinkle, however, is that only Harrison verified the AC.  *See* AC at 20.  So the AC's evidentiary value is limited to just those allegations that "[he] knows to be true of his . . . own knowledge," and not those allegations within Mazza's knowledge, which are not properly verified.  *See* 5A Wright & Miller, 5A Federal Practice and Procedure § 1339 (4th ed., last updated June 2024).  Nevertheless, as will become clear, this issue ends up being immaterial because the resolution of this motion does not turn on the AC's evidentiary value.

point, "made unprofessional comments and gestures toward one woman, causing at least one complaint to be made to Legotte." *Id.* ¶ 13.  Legotte has been the President of Local One since 2007.  *Id.* ¶ 11.

Harrison states that on April 28, 2023, Legotte summoned him and told him to resign from his position or face disciplinary charges.  *Id.* ¶ 16.  He chose to resign.  *Id.*  At a June 2023 Local One meeting, Harrison apologized to the members, and "opened up about health issues and other personal issues, admitted to making 'bad choices[,]' and acting in ways improper for someone in his position."  *Id.* ¶ 17.  Legotte appointed Richard Loeb to Harrison's vacated position.  *Id.* ¶ 19.  In September 2023, there were elections for that position.  *Id.* ¶ 18.  Legotte supported Loeb, while Harrison supported Andy Schrettner, a Local One field employee.  *Id.* ¶ 19.  Harrison campaigned for Schrettner and Schrettner won the election.  *Id.* ¶¶ 19–21.

### B.  Union Charges Against Harrison and Trial

On October 4, 2023, Legotte filed union charges against Harrison, accusing him of violating certain provisions of the International's Constitution and By-Laws.  *Id.* ¶ 22; *see also* ECF No. 6-2 (Written Charges).  The charges related to his conduct at the Washington, D.C. conference.  *See* ECF No. 6-2.  Harrison claims that the charges should have been filed with Local One but were instead lodged with the International.  AC ¶ 23.  On October 31, 2023, the International's President, Frank Christensen, appointed a trial board consisting of two union regional directors (the "Trial Board").  *Id.* ¶¶ 24–25; *see also* ECF No. 6-3.  On that date, the International emailed the charges to Harrison.  *Id.* ¶ 25; *see also* ECF No. 6-4.  Harrison says that the International mailed him a notice of the trial date, but it was not by registered mail and therefore not in compliance with the International's Constitution, and that he also did not receive email notice of the trial date.  AC ¶ 26.  The hearing was held on December 12, 2023, with

3

Legotte and Christensen providing testimony.  *Id.* ¶ 27.  Harrison did not appear.  *See* ECF

No. 6-6 at 2 (Trial Board Decision).

On January 9, 2024,[4] the Trial Board issued its decision.  Given its centrality to this case,

the Court now quotes it at length:

> The testimony showed that on April 23, 2023, Brother Joe Harrison was in attendance at the Helmets to Hardhat event and continued after that to the Penn social event in Washington at the Legislative Conference.  He drank to excess to the point where he was so drunk that he was unable to walk.  General President Christensen instructed now Regional Director Bobby Capuani, who was an organizer at the time, to put him in a cab and get him back to the hotel.  When they got back to the hotel, Brother Harrison fell out of the cab in front of many [International] members who were socializing outside the hotel.  He couldn't walk and had to be carried to his room at that time.
>
> The next morning, Brother Legotte instructed Brother Harrison to go home due to his unprofessional behavior.  Brother Harrison pleaded with Brother Legotte to be allowed to stay at the Conference.  Brother Legotte agreed to allow Brother Harrison to stay on the condition that [he] not drink any more alcohol for the rest of the Conference.  Brother Harrison agreed to those terms.
>
> However, on Tuesday, April 25, 2023, Brother Harrison went out to dinner with the Local 1 Executive Board and, contrary to his agreement with Brother Legotte, drank heavily during the dinner.  He harassed an African American waitress by making racist comments and singing suggestive songs to her.  His behavior was so out of line and inappropriate that members of the Local 1 Executive Board had to admonish him to keep his mouth shut or they were going to have a problem.  After dinner the group went out to a bar to watch the Rangers hockey game.  Brother Harrison accompanied them to the bar, where, in a state of obvious drunkenness, he started harassing and groping the LIUNA's[5] Safety Director's wife.
>
> The Laborer[s'] Safety Director saw what was going on and came over to try and [*sic*] deescalate the situation.  Brother Harrison continued to be obnoxious towards the Safety Director's wife right in front of him, kissing her hand[,] etc.  At one point, Brother Harrison had the bad sense to say to the Safety Director, "you're being rude can't you see I am talking to your wife."  At this point the Laborer[s'] Safety Director and his wife had heard enough and left for another part of the bar.  Some Local 1 members had seen enough and told Brother Harrison it was time for

---

[4]    The AC incorrectly refers to this as January 9, 2023.  AC ¶ 28.

[5]    LIUNA stands for the Laborers' International Union of North America.  *See* ECF No. 6-14 at 2.

him to leave.  On the way out the door, Brother Harrison came up behind the Safety Director, locked his arm from behind, and started spanking him on his behind.

Needless to say, Brother Harrison's behavior was unprofessional and improper and caused a great deal of embarrassment to the [International].  As a result, Local 1 and the International . . . had to do damage control with another Union due to these appalling actions.  Local 1 sent a gift basket to the Safety Director and his wife, apologizing on behalf of the Union for Brother Harrison's bad behavior.  General President Christensen had to meet with the LIUNA General President to assure that there were no hard feelings stemming from Brother Harrision's boorish actions.  LIUNA is one of the largest and most powerful of the building trades unions.  One of the purposes for the annual Conference is to promote brotherhood and solidarity throughout the building trade unions.  Brother Harrison, through his drunken and irresponsible acts, created unnecessary tensions between the [International] and LIUNA.

*See* ECF No. 6-6 at 2–3.  Based on those findings, the Trial Board found Harrison guilty of four union charges.  *See id.* at 1, 3.  It then (1) expelled him from the International; (2) required him to enroll in a substance abuse program and to provide proof of completion; (3) fined him $10,000 (with $2,000 due upon his re-initiation and $8,000 "held in abeyance" provided that he complete the program and not receive more charges for five years); and (4) barred him from running for or from being appointed to a local office or an International office for five years.  *See id.* at 3.

### C.  Harrison's Appeal

Harrison says that he was surprised to receive the decision because he did not know that a trial had taken place, and he requested the trial transcript and other documents on January 29, 2024, and received them two days later.  AC ¶¶ 29–30.  In February 2024, he appealed to the General Executive Board[6] ("GEB"), claiming that (1) he did not receive notice of the hearing; (2) the charges against him were politically motivated and that Legotte filed them because of Harrison's support for Schrettner; and (3) that he was disabled because of his alcoholism and therefore should not have been expelled, or that he at least should have been accommodated,

---

[6]     The AC incorrectly refers to this as the General Election Board.  AC ¶ 31.

pursuant to New York State and New York City law.  *See* ECF No. 6-9 at 1–2.  That letter cited federal statutes and case law.  *See id.*  The International's General Secretary-Treasurer sent Harrison a letter indicating that the appeal would be heard at the GEB meeting on April 25, 2024, and informing him that he could appear at his own expense as well as of the April 12 deadline for the submission of information.  *See* ECF No. 6-11 at 1.  Harrison wrote to the GEB on April 10, informing it that he would appear in person and that Michael Riegger would also be available by phone to provide information.  *See* ECF No. 6-12 at 1.  He stated that Riegger was a "witness" to his "claim that there was a mutual agreement made with Brother Legotte at the time of [his] resignation" that if he resigned, charges would not be filed against him.  *See id.*   The General Secretary-Treasurer wrote back on April 16, 2024, indicating that Harrison was "welcome to appear and state [his] case" but that Riegger would not be permitted to appear because "we do not entertain testimony in the appeals proceedings and do not typically have any appearances by telephone during these proceedings."  *See* ECF No. 6-13 at 1.

On May 20, 2024, the General Secretary-Treasurer sent a letter to Legotte, copying Harrison, rejecting each of his claims on appeal.  *See* ECF No. 6-14.[7]  First, the letter states that at the GEB appeal, Harrison "admitted that the certified letter notifying him of the trial was correctly addressed to his home," but that "he didn't receive it because he 'wasn't looking for it' and because his kids might have misplaced the mail."  *Id.* at 3.  It went on to state that the GEB asked him if there was anything he would have said at his trial, to which he responded "that he was guilty of conduct unbecoming."  *Id.*  According to the letter, he "admit[ted] being out of control on April 23," "admit[ted] being told by Brother Legotte to go home," "admit[ted] begging to be allowed to stay," and "admit[ted] [to] being drunk and out of control again the

---

[7]    A few lines of this letter are not visible, but the material portions of it are not in dispute.

very next night." *Id.* Although "[h]e denied making harassing statements, groping women[,] and assaulting men while drunk" by claiming that he was just "dancing out of control," he "admitted [that] he was at fault for behaving inappropriately at the conference." *Id.* He primarily argued that the imposed punishment was excessive. *Id.*

Second, the GEB rejected his argument that the charges were politically motivated. *Id.* The letter recounts that at the appeal, "General President Christensen noted that Local 1 and the International had sent flowers to the LIUNA Safety Director and his wife, and that . . . Christensen had called them personally, apologized for . . . Harrison's conduct, and explained that harassment and groping have no place in the [International]." *Id.* To that, "Harrison continued to insist that he didn't do anything warranting his expulsion, and continued to insist [that] the charges were politically motivated." *Id.*

Finally, the GEB noted that Harrison's arguments regarding his alcoholism in his appeal letter were inconsistent with his position at the appeal hearing, where he denied that he had a problem with alcohol and was in need of treatment. *Id.* He further stated that he had not sought alcohol treatment despite the Trial Board's decision requiring as much. *Id.* When the GEB asked him if he thought he had a drinking problem, Harrison responded that he "lawyered up" and was not familiar with the content of the appeal letter that he had signed. *Id.*

In light of the foregoing, the GEB concluded that Harrison was not denied due process due to him allegedly not receiving the trial notice, and that, in any event, the charging party had proved its case and, furthermore, "Harrison admitted during his appeal that he was guilty of improper conduct during the . . . legislative conference." *Id.* at 4. It further stated that there was "no evidence that the charges were politically motivated" and that Harrison had "engaged in serious misconduct in front of many witnesses during one of the biggest union trades events of

the year." *Id.* The GEB explained that it was "particularly troubled that . . . Harrison blamed his behavior on alcohol use disorder in his written appeal, but then appeared in person and claimed he did not have a problem with alcohol, refused to seek treatment as ordered by the [T]rial [Board], and continues to drink." *Id.* It also wrote that it was "particularly troubled that he denied harassing or groping anyone despite many witnesses to his behavior" and that Christensen needed to call the LIUNA Safety Director to apologize. *Id.* It concluded that it was "left with the definite and firm impression that . . . Harrison has not taken responsibility for his actions" and "was and continues to be a liability to the [International]." *Id.* at 5.

### D. After Harrison's Failed Appeal

After the GEB rendered its decision, Harrison says that he sought treatment for his "alcohol issues" and applied for union membership again two months later. AC ¶ 37. In August 2024, Harrison says he "supplied proof of enrollment to a certified / accredited program" and "was informed that [the] Local One Executive Board directed him to contact Brendan Loftus," a "Legotte appointee," to supervise his treatment, but "the Executive Board never gave any such direction." *Id.* ¶ 38.[8] Harrison gave "that information" to Loftus, and Loftus "added a requirement that Harrison be tested weekly, and that the reports go to [Loftus] directly." *Id.* ¶ 39. He states that he has had "100% clean toxicology reports" but has not been readmitted to Local One, rendering him unable to "attend or speak at meetings, nominate candidates for office, or vote in the upcoming Union election." *Id.* ¶ 40.

---

[8]     The allegation is in the passive voice. Harrison does not allege to whom he provided "proof of enrollment," nor does he state who informed him that the Local One board "directed him" to contact Loftus.

### E.  *Mazza and the Election for Harrison's Position*

Mazza has been a Local One member since 1998 and was elected as a Vice President in 2010.  *Id.* ¶ 41.  In that role, he worked as a Business Agent representing Local One members.  *Id.*  He states that in early September 2023, he "was contacted by a number of Local One members about an incident involving Appointed Organizer Brian Houser."  *Id.* ¶ 42.  That led him to "discover[]" that Houser "had threatened and attempted to intimidate" Schrettner, who, as discussed above, was running to fill the position that had been vacated by Harrison.  *Id.*  Like Harrison, Mazza was supporting Schrettner in that race.  *Id.*  According to Mazza, Houser "charged at Schrettner" at a bar and "wound up assaulting several members when he tried to get at Schrettner."  *Id.*  Legotte was reportedly present.  *Id.*

### F.  *Conflict Between Mazza and Legotte*

On September 11, 2023, Mazza sent a letter to Legotte, describing the incident, urging the removal of Houser from his position, and demanding that he "be prohibited from holding any appointed position in th[e] Union at any future date."  *See* ECF No. 6-15 at 1–3.  The letter accused Houser of violating the Local's Constitution and various crimes.  *See id.* at 1–2.  It also alleged violations of the LMRDA, including citations to federal statutes and case law.  *See id.* at 2.  Mazza says that, after sending that letter, Legotte called him and ordered him to end his investigation into Houser, reportedly stating that "Andy [Schrettner] better watch the fuck out," that Mazza would be "opening a can of worms" by pursuing the issue, and that he would "go fucking nuclear" on Mazza if Mazza probed Legotte or Loeb, the candidate opposing Schrettner.  AC ¶ 44 (brackets in original).

One week after Schrettner won the election, on September 28, 2023, Mazza says Legotte moved him from Brooklyn and East Manhattan to Staten Island, the Bronx, and Westchester, a

territory he claims is generally covered by a new Business Agent and which he and other members viewed as a "demotion." *Id.* ¶¶ 45–47. Mazza was also removed from the 401(k) and Annuity Plan Board, a position he had held for 13 years. *Id.* ¶ 48.

On October 17, 2023, at an Executive Board meeting, Legotte reportedly said that he trusted everyone in the room to help with upcoming contract negotiations except for Mazza, to whom Legotte said, "you're done." *Id.* ¶ 50. When Mazza asked Legotte if that was a threat, Legotte reportedly replied, "it's a promise," and Mazza reported the incident to the NYPD. *Id.* After the contract negotiations began, Legotte reportedly told Mazza that he would not participate if Mazza did, even though Local One Vice Presidents normally would be there, and Legotte thereafter excluded Mazza. *Id.* ¶¶ 51–52.

In January 2024, at an Executive Board meeting, Legotte reportedly demanded that Mazza retract his letter about Houser, but when Mazza refused, Legotte had him leave the room. *Id.* ¶ 53. Mazza then heard Legotte say, "Fuck him, we may be down to three [Business Agents] soon." *Id.* When Mazza reappeared, Legotte apparently tried to get the Executive Board to "censor" him and require him to withdraw the Houser letter, but the Executive Board declined to do so. *Id.* ¶¶ 53–54.

On April 19, 2024, Mazza sent Legotte a lengthy letter. *See* ECF No. 6-16. First, he detailed his allegations concerning the September 2023 incident at the bar and subsequent call with Legotte. *Id.* at 1–2. Second, he recounted his transfer and removal from the 401(k) board after Schrettner's election. *Id.* at 2. Third, he complained of being threatened in the run up to the contract negotiations and exclusion from the negotiations. *Id.* Fourth, he discussed the January 2024 Executive Board meeting where Legotte allegedly tried to force him to retract his complaint about Houser. *Id.* at 2–3. The letter then went into a legal analysis, making the case

that Legotte "potentially violated the LMRDA" by interfering with the free speech rights of Mazza and others. *Id.* at 3–4. He also said that Legotte had violated union policy by, in addition to engaging in the conduct described above, "countless times berat[ing] [him] with slurs and profanity." *Id.* at 4. He demanded that the Executive Board appoint independent counsel to investigate the issues described in his letter and determine whether formal charges were necessary, and also threatened legal action. *Id.* at 4–5.

Mazza then went into a discussion of alleged retaliation against Harrison, as discussed above, stating that the charges against Harrison were "pretext for [his] support of" Schrettner. *Id.* at 5. The letter included several allegations not yet discussed; for example, Mazza claimed that Legotte sent a "shot across the bow" to Harrison by having a lawyer send a letter to Harrison's employer warning it against allowing employees like Harrison to campaign for Schrettner while on paid time, all while Legotte and others campaigned for Loeb on paid time. *Id.* at 5–6. In addition to claiming that the charges against Harrison were politically motivated, Mazza accused Legotte of denying Harrison a fair hearing by concealing the charges from Local One's Executive Board and bringing them directly to the International. *Id.* at 6. He said that Legotte unfairly presented the evidence at Harrison's union trial and also failed to confirm that Harrison received notice of the trial. *Id.* at 6–7. Mazza indicated that he was "bringing formal charges against [Legotte] for political retaliation against Brother Harrison." *Id.* at 7.

### G. *Mazza Files Charges*

On May 28, 2024, Mazza sent a letter to Christensen, the International's President, attaching formal charges against Legotte, in which he principally referenced the allegations just described in the letter he had sent to Legotte. *See* ECF No. 6-17. In his letter to Christensen, he described a May 14, 2024, Executive Board meeting, the first since he sent his letter to Legotte:

> At that meeting, when the subject of retaining independent counsel was raised, Brother Legotte informed the Board that it would not be necessary to retain said counsel. He stated this was because, per his own words, "I DID IT. You don't need independent counsel. I did it. I admit it. Everything in this letter, I ADMIT IT." He then proceeded to state "[a]s far as Joe Harrison goes, you don't need [Mike] Riegger as a witness, I DID IT. I did that too." He then proceeded to wave my letter in his hand and continue to shout, "I DID IT" and "I ADMIT IT." **He said this in front of all sixteen members of the Executive Board.** He then proceeded to curse, threaten, and belittle me, condescendingly asking whether I still intended to bring charges.

*Id.* at 1–2 (brackets and emphasis in original). Mazza claims that Legotte's "admission" had been included in Executive Board minutes but Legotte later succeeded in a vote to have it removed. AC ¶ 62. On July 15, 2024, Christensen sent a letter to Mazza in which he referenced Mazza's statement that the charges against Legotte had been referred to Local One's Executive Board and therefore was "not of aware of circumstances that would warrant the International's involvement." *See* ECF No. 6-18 at 1. Mazza says that as of the time he filed the AC in January 2025, Local One's Executive Board had not acted on the charges. AC ¶ 64.

## H. Elections

Local One has elections every three years. *Id.* ¶ 10. The next election is in June 2025. *Id.* According to Plaintiffs, it will be the first contested election since 2007,[9] with Plaintiff Mazza challenging Legotte. *Id.* ¶¶ 10, 65. Harrison "wishes to be able to vote in that election, and possibly to run for office," which he is not currently permitted to do. *Id.* ¶ 66.

## I. This Case

Plaintiffs initiated this action on December 17, 2024, by filing the initial complaint. *See* ECF No. 1. Then, on January 2, 2025, they filed the AC. *See* ECF No. 6. After that, the first

---

[9]    As on several issues, Local One Defendants contest this. *See* ECF No. 35 ¶ 83 (Legotte declaring that he was most recently elected in a contested race in 2022). But given the expedited nature of this motion and the basis of its resolution, the Court need not (at least yet) attempt to resolve these disputes.

substantive filing took place when the International filed a pre-motion letter in anticipation of a motion to dismiss on January 30, 2024, and Local One Defendants filed their pre-motion letter on February 3, 2025.  *See* ECF Nos. 19, 20.  Plaintiffs filed their opposition letter on February 7, 2025.  *See* ECF No. 21.

The case was reassigned to the undersigned on February 10, 2025, and the Court denied the requests for pre-motion conferences and set a briefing schedule for the motion to dismiss. *See* Feb. 10, 2025, Text Order.  After additional motion practice (discussed further below), on March 3, 2025, Plaintiffs filed their preliminary injunction motion.  *See* ECF No. 25.  As relevant here, Plaintiffs seek a preliminary injunction

> [r]estraining and enjoining Defendants . . . a) from continuing to deny membership rights to Plaintiff Harrison, including the right to vote in the next election of Local One, and to run for office; b) from failing to reinstate Plaintiff Mazza to his former Business Agent assignment; c) from engaging in any acts of retaliation against Harrison or Mazza; and . . . from engaging in any acts which restrain and / or chill Local One members' exercise of the right to speak, run for office, or support candidates in union elections.

*Id.* at 1–2.  The preliminary injunction motion also sought leave to file a proposed second amended complaint.  *See id.* at 1; ECF No. 25-5.  Further, as relevant here, on March 4, 2025, Plaintiffs explained that they requested a "tight briefing schedule" for the preliminary injunction in their notice of motion and requested a hearing on their PI "sometime near" March 25, 2025, because "[t]he election in Local One sees nominations in May and in-person voting in June." *See* ECF No. 26 at 1.

On the next day, the Court entered the following Order:

> ORDER:  Plaintiffs have filed a motion for a preliminary injunction and a motion for leave to file a second amended complaint.  *See* ECF No. 25.  They have also filed a motion for leave to file excess pages and a motion for a hearing.  *See* ECF No. 26.  The motion to file excess pages is GRANTED.  The request for leave to amend is procedurally defective because it was filed without a pre-motion letter. *See* Individual Practices §§ IV.A.2, IV.A.2.a.  Nevertheless, because the request for leave to amend is simple, the Court exercises its discretion to excuse compliance

with the Rule and directs Defendants to respond to the request for leave to amend on or before March 11, 2025. Each Defendant group may file a letter in Opposition not to exceed five pages. Their Opposition(s) shall specifically address the effect of any amendment on the motion for a preliminary injunction. Relatedly, because the request for leave to amend may render moot any forthcoming motions to dismiss, the Court VACATES the previously ordered briefing schedule for the motions to dismiss and will set a schedule for any forthcoming motions to dismiss after resolution of the motion for leave to amend and motion for a preliminary injunction. *See* Feb. 10, 2025, Text Order. With respect to the motion for a preliminary injunction, the Court directs Defendants to file their Opposition(s) on or before March 18, 2025, and Plaintiffs may file a reply, if any, on or before March 25, 2025. The motion for a hearing is HELD IN ABEYANCE.

On March 13, 2025, the Court denied Plaintiffs' motion to amend, finding that the proposed amendments were brought in bad faith. *See Harrison v. Loc. One, Int'l Union of Elevator Constructors of N.Y. & N.J.*, No. 24-cv-08619, 2025 WL 813609, at *2 (E.D.N.Y. Mar. 13, 2025). Subsequently, the Court denied Plaintiffs' untimely motion to file a late reply, *see* Mar. 26, 2025, Text Order, and later struck the unauthorized late reply filed by Plaintiffs, *see* Mar. 28, 2025, Text Order.

The following papers are now before the Court: ECF No. 25 (Pls.' Prelim. Inj. Mot.); ECF No. 26 (Pls.' Hr'g Mot.); ECF No. 32 (Def. International's Opp.); ECF No. 34 (Local One Defs.' Decl.); ECF No. 35 (Local One Defs.' Decl.); ECF No. 36 (Local One Defs.' Opp.); ECF No. 37 (Local One Defs.' Excess Page Mot.)[10]; ECF No. 40 (Local One Defs.' Decl.)[11].

## <u>LEGAL STANDARDS</u>

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024). To

---

[10]    The motion to file an oversized declaration is granted.

[11]    This redacted document replaces ECF No. 33, which the Court partially sealed upon motion of Local One Defendants. *See* ECF No. 38; Mar. 19, 2025, Text Order.

obtain a preliminary injunction, a party must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.*

## **DISCUSSION**

For the reasons explained below, Plaintiffs fail to demonstrate irreparable harm, which is fatal to their motion.  The Court begins its analysis by briefly addressing Plaintiffs' motion for a hearing and proceeds to its analysis of the preliminary injunction factors.

### I.      **Motion for Hearing**

Plaintiffs move for a preliminary injunction hearing, arguing that the Court must make credibility determinations.  *See* ECF No. 26 at 1.  For example, they argue that Legotte would deny making an agreement with Harrison regarding the latter's resignation.  *Id.*  They also indicate that "non-party witness[es]" who saw Legotte "threaten[]" Mazza at Executive Board meetings and "admit" to the allegations Mazza made against him "could be subpoenaed."  *Id.*  Despite those arguments, no hearing is needed to resolve this motion.  On a motion like this one, "there should generally be an evidentiary hearing when essential facts are in dispute."  *See State Farm*, 120 F.4th at 83.  It follows that such a hearing "is not required in all cases, such as cases in which the affidavits submitted by the parties provide an adequate basis for the court's decision."  *See Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 386 n.3 (E.D.N.Y. 2021); *see also Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997) ("[T]here is no hard and fast rule . . . that oral testimony must be taken . . . or that the court can in no circumstances dispose of the [preliminary injunction] motion on the papers before it.").  Here, as will be explained momentarily, the lack of a showing of irreparable injury is "the most

significant factor[]" in this case, and the Court's analysis on that point "would . . . remain[] essentially unchanged by any additional evidence at a hearing." *See Weisshaus*, 512 F. Supp. 3d at 386 n.3.  The motion for a hearing is therefore denied.

## II.    Preliminary Injunction Factors

### A.    *Irreparable Harm*

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm*, 120 F.4th at 80.  "This requirement must therefore be satisfied before the other requirements for an injunction can be considered." *Id.* "To make this showing, the moving party must demonstrate that absent a preliminary injunction it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*  Of course, a preliminary injunction is a form of equitable relief; thus, "where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.*  Importantly, this case involves a request for a mandatory injunction, or one that changes the *status quo*, in which Plaintiffs ask the Court to compel Defendants to reinstate Harrison and change Mazza's assignment.  *See* ECF No. 25 at 2.  Plaintiffs are therefore subject to a "heightened standard," requiring them to make a "strong showing of irreparable harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023).

Even though the demonstration of irreparable harm is a prerequisite to the issuance of the injunction Plaintiffs seek, they devote just a few sentences to it in their motion.  *See* ECF No. 25-29 at 29–30.  Their argument is essentially that Local One is corrupt, will soon hold an election, and that a "broad injunction," which includes restoring Harrison and Mazza to their former positions, unlike money damages, "can address an unfair union election." *See id.*  They also

generally reference the right of union members "to speak out on issues" as an irreparable harm. *See id.* at 29. Defendants argue that Plaintiffs cannot demonstrate irreparable harm. First, they both point to Plaintiffs' delay in seeking this relief. *See* ECF No. 32 at 7–9; ECF No. 36 at 30–31. Second, they attack Plaintiffs' proffered injuries concerning members' speech rights and an "unfair election" as hypothetical and nonspecific. *See* ECF No. 32 at 9–10; ECF No. 36 at 28–30. On both points, the Court agrees.

i.    <u>Unjustified Delay</u>

Plaintiffs' unexplained delay in seeking preliminary injunctive relief is fatal to their claim of irreparable harm and, as a result, to their motion. As mentioned, Plaintiffs initiated this action on December 17, 2024, by filing the initial complaint, which included a request for preliminary injunctive relief but no preliminary injunction motion. *See* ECF No. 1 at 17–18. The same was true of the AC, filed on January 2, 2025. *See* ECF No. 6 at 18. On February 7, 2025, in opposition to the Defendants' pre-motion conference letter, they indicated that "Plaintiffs will be filing a [preliminary injunction motion] in around two weeks (delayed only due to [counsel's] illness)." *See* ECF No. 21 at 1. Then, three weeks later, on February 28, 2025, Plaintiffs filed an "Order to Show Cause for a Preliminary Injunction," *see* ECF No. 24, which the Court struck on the next day for failure to comply with Local Civil Rule 6.1, *see* Mar. 1, 2025, Text Order. A complete motion was not filed until March 3, 2025. *See* ECF No. 25.

The Second Circuit has explained that unexplained delay—"either in bringing suit or in moving for preliminary injunctive relief"—"may justify denial of a preliminary injunction." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). That is because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Id.* Such is the case

here.  As stated by the International, "Harrison waited until March 3, 2025—over nine months after the [GEB] denied his appeal on May 20, 2024—to properly seek injunctive relief before this [C]ourt."  ECF No. 32 at 8.  Similarly, Mazza complained to Christensen of "violations of . . . federal labor law" just days later on May 28, 2024.  *See* ECF No. 6-17 at 1.[12]  Specifically, Plaintiffs waited nearly seven months to initiate the case, and then another two and a half months to file the preliminary injunction motion.  Even allowing for a brief delay due to counsel's illness,[13] there is no reasonable explanation for their laches.  Indeed, the impetus for finally moving for an injunction appears to be that the election nominations will take place in May.  *See* ECF No. 26 at 1.[14]  But as the Court has already explained in this case, "Plaintiffs are in poor position to complain of a delay of their own making."  *See* Mar. 1, 2025, Text Order.  After all, where "irreparability is a product of the moving party's own delay," it "is inequitable to the other party and to the courts as well."  *Hirschfeld v. Bd. of Elecs.*, 984 F.2d 35, 39 (2d Cir. 1993).

The Court of Appeals and district courts in this Circuit routinely decline to award preliminary injunctive relief when confronted with comparable or even much shorter periods of unjustified delay in initiating suit or moving for injunctive relief.  *See, e.g.*, *Tough Traveler*, 60 F.3d at 968 (vacating preliminary injunction where plaintiff waited at least nine months to sue

---

[12]    That provides a generous starting point for Mazza.  His delay is seemingly worse.  Recall that he asks the Court "reinstate [him] to his former Business Agent assignment."  *See* ECF No. 25 at 2.  But he lost that assignment on September 28, 2023, AC ¶ 46, and did not sue until over fourteen and a half months later.  And he finally moved for a preliminary injunction over 17 months later.

[13]    This issue is entitled to particularly little weight in this case.  As argued by the International, ECF No. 32 at 8–9, documents Plaintiffs attached to the AC show Harrison forwarding the formal charges from the International to Plaintiffs' counsel as early as February 4, 2024, *see* ECF No. 6-4, and Plaintiffs' counsel was copied on Harrison's February 12, 2024, appeal letter to the GEB, *see* ECF No. 6-9 at 2.

[14]    At another point, Plaintiffs have claimed that "this motion needs to be resolved before mid-*April*[,] when nominations are made."  ECF No. 24-1 ¶ 16 (emphasis added).

after receiving notice and an additional four months to move for a preliminary injunction);

*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (same where plaintiffs did not sue

until nine months after receiving notice in the press and 10 weeks after receiving actual notice);

*Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-cv-8028, 2018 WL 2089342, at *2 (S.D.N.Y.

May 3, 2018) (collecting cases and explaining that although "[t]here is no bright-line rule for

how much delay is too much," "courts in this Circuit typically decline to grant preliminary

injunctions in the face of unexplained delays of more than two months"); *see also Weight*

*Watchers Int'l, Inc. v. Luigino's Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays

of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential

to the issuance of a preliminary injunction."). This Court joins them in finding that Plaintiffs'

delay of seven months in suing and of two and a half more months in moving for an injunction

negates their claim of irreparable injury. *See Damone v. Teamsters Loc. 804*, No. 18-cv-4059,

2018 WL 7821134, at *2 (E.D.N.Y. Oct. 30, 2018) (finding no irreparable harm in view of nine-

month gap between the GEB's upholding of charges and the filing of plaintiffs' preliminary

injunction motion). As the International puts it, any claim to irreparable injury hinges on the

"special importance of *this* election," but Plaintiffs plainly failed to treat it as especially

important by waiting so long to act. ECF No. 32 at 10 (emphasis in original). The Court

therefore denies their preliminary injunction motion on this basis alone.

      ii.    <u>Injury</u>

      The Court also agrees with Defendants that Plaintiffs have failed to demonstrate an

"actual and imminent" injury requiring such extraordinary intervention. *See State Farm*, 120

F.4th at 80. Start with Mazza. If the supposed trigger for the irreparability of the injuries is the

upcoming election, his demand that Local One reinstate him to "his old territory and Fund

offices"[15] bears no connection to that rationale, and he does not argue otherwise.  *See* ECF No. 25-29 at 29.  He also asks the Court to bar Defendants from "engaging in any acts of retaliation against" him.  *See* ECF No. 25 at 2.  In an affidavit filed in connection with the instant motion, he states that he intends to run against Legotte in the "May 2025"[16] election.  *See* ECF No. 25-2 ¶ 26.  Notably, he does not indicate that anyone is doing anything to stop him from doing that.  *Cf. Kent v. N.Y. State Pub. Emps. Fed'n*, No. 17-cv-0268, 2017 WL 11698626, at *3, *8 (N.D.N.Y. Oct. 18, 2017) (plaintiffs failed to show irreparable harm where it was undisputed that they could participate in the union convention in various ways as union members even if union ethics charges against them prevented full participation).  Rather, he asserts that it is "likely that Legotte will engage in additional threats and take retaliatory actions, that he and his appointed officers, like Houser, will engage in efforts to undermine the election, and intimidate members so as to restrict their right (and [his] right) of free speech."  ECF No. 25-2 ¶ 26.  But that is just conjecture.  Local One Defendants are right that that speculative fear of injury falls far below what is required for the Court to enjoin Defendants.  *See* ECF No. 36 at 29–30.  Even if the Court were to assume that Legotte illegally retaliated against him in the past, that, standing alone, would be insufficient "to establish likelihood of continuing harm" warranting injunctive relief.  *See Smith v. City of New York*, No. 23-cv-08229, 2024 WL 4582367, at *2–3 (S.D.N.Y. Oct. 25, 2024) (plaintiff failed to establish prospective harm based on alleged past conduct).

Harrison fares no better.  He wants the Court to require Local One to make him an active member so that he can vote in the upcoming elections and possibly run for office himself.  *See* ECF No. 25 at 2.  As an initial matter, his claim that he will be irreparably injured by not being

---

[15]    It is inconsequential here, but this request in the brief varies slightly from the motion itself, which refers only to "his former Business Agent assignment."  ECF No. 25 at 2.

[16]    He alleges elsewhere that the election will take place in June 2025.  AC ¶ 11.

allowed to run for office—"It is possible that I may also run for office," ECF No. 25-1 ¶ 35—is obviously speculative. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (explaining that "likelihood" of irreparable harm "sets, of course, a higher standard than 'possibility'"). So, his issue boils down to not being able to vote in the union election.[17] However, he never explains why that harm is irreparable since if he prevails at trial, the Court could order a new election. For this reason, district courts have repeatedly denied injunctive relief in cases involving union members protesting exclusion from union activities, including voting and running in union elections. *See Bernard v. Loc. 100, Transp. Workers Union of Am.*, 873 F. Supp. 824, 827–28 (S.D.N.Y. Jan. 5, 1995) ("[I]f it is determined that [plaintiff] should have been a candidate, the union will be required to hold another election. There is no demonstration on this record that the plaintiffs would be prejudiced by such a procedure."), *aff'd*, 112 F.3d 67 (2d Cir. 1997); *accord Chevalier v. Civ. Serv. Emps. Ass'n*, No. 10-cv-446, 2011 WL 1298739, at *4–5 (N.D.N.Y. Mar. 31, 2011); *Smith v. Bowers*, 337 F. Supp. 2d 576, 592 (S.D.N.Y. 2004); *see also Weiss v. Torpey*, 987 F. Supp. 212, 217 (E.D.N.Y. 1997) ("[A]s other

---

[17]     His fleeting attempt to frame this as a speech claim is unavailing. *See* ECF No. 25-29 at 29 ("Where the right of all Union members to speak out on issues is implicated or potentially chilled by Union conduct Court [*sic*] in this District have found irreparable harm."). That repackaging would allow any plaintiff subject to union discipline—even if entirely legitimate— to establish irreparable injury merely because a consequence of such discipline is a curtailed ability to fully express herself on union matters (*e.g.*, at meetings). Accordingly, in the preliminary injunction posture, courts look for evidence of defendants' conduct creating a "chilling effect" on union members' rights of expression—a standard Plaintiffs themselves invoke. *See id.* at 29. However, there is simply no evidence of that in this fairly developed record: "Plaintiff [Harrison] is the only . . . member who has asserted any kind of chilling effect." *See Patrick v. Loc. 51, Am. Postal Workers Union*, No. 19-cv-10715, 2020 WL 703392, at *9 (S.D.N.Y. Feb. 11, 2020) (finding no irreparable harm to expression following the union's suspension of a member in the absence of evidence of "fears of speaking openly about union matters or fears of reprisals"). Mazza, for example, intends to run against Legotte in the upcoming election and has not been prevented from doing so. *See* ECF No. 25-2 ¶ 26. Similarly, the Court has no basis to enjoin Defendants from "engaging in any acts of retaliation against [him]." *See* ECF No. 25 at 2. He is not currently in the union and any prospective concerns about targeted retaliation are speculative.

courts have recognized, even if the elections proceed, there will be no irreparable injury because if it is ultimately determined on the merits that the reorganization ordered by the [union] was illegal and the election improper, the results of the upcoming election could be voided and another election held.").[18]  He thus fails to show *irreparable* harm to his voting rights.

Finally, it also appears that Plaintiffs are attempting to obtain relief for other union members because of a purported risk of infringement of their speech rights.  Specifically, Plaintiffs seek sweeping relief that would prohibit Defendants "from engaging in any acts which restrain and / or chill Local One members' exercise of the right to speak, run for office, or support candidates in union elections."  *See* ECF No. 25 at 2.  There are two serious problems with that request.  First, Plaintiffs, even if troubled by Local One's alleged "recent sordid history of corruption," ECF No. 25-29 at 29, have no standing to assert the rights of others here.  *See, e.g.*, *Highview Props D.H.F. Inc. v. Town of Monroe*, 606 F. Supp. 3d 5, 20 (S.D.N.Y. 2022) (plaintiff lacked standing to assert the rights of a religious community).  Nor does this Court have any free-ranging oversight authority to police good union governance.  *See Gurton v. Arons*, 339 F.2d 371, 375 (2d Cir. 1964) ("The provisions of the L.M.R.D.A. were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions.  Courts have no special expertise in the operation of unions which would justify a broad power to interfere.").  And second, for the reasons already explained, their claims of prospective injury to others' rights of expression are speculative.  *See supra* note 17.

---

[18]     At least one other court has also found no irreparable injury in these circumstances, even without a discussion of the potential remedy of a new election.  *See Fodera v. Loc. 813 Int'l Bhd. of Teamsters*, No. 05-cv-2489, 2005 WL 2175887, at *2 (E.D.N.Y. Sept. 8, 2005).

### B.    Other Preliminary Injunction Factors

Because the Court has found that Plaintiffs have failed to carry their burden as to irreparable harm, it "need not even address the remaining elements of the test." *Monowise*, 2018 WL 2089342, at *1. Such a course is particularly appropriate here because eschewing a detailed treatment of Plaintiffs' likelihood of success on their eight causes of action will significantly expedite the resolution of this motion, allowing this case to proceed and lifting any uncertainty that this motion may present for the forthcoming election. *See Saba Cap. Master Fund, Ltd. v. BlackRock ESG Cap. Allocation Term Tr.*, No. 24-cv-01701, 2024 WL 3162935, at *6 (S.D.N.Y. June 25, 2024) (declining to address preliminary injunction factors beyond irreparable harm "[p]articularly in light of the fast-approaching shareholder meeting and the benefit to all parties of having a decision on the motion prior to that meeting"). That concern is especially potent in this context, where the Second Circuit has cautioned that "federal courts should be slow to rush into what is essentially a matter of internal union governance." *Int'l Bhd. of Teamsters v. Loc. Union No. 810*, 19 F.3d 786, 788 (2d Cir. 1994).

\*               \*               \*

## <u>CONCLUSION</u>

For the reasons provided herein, Plaintiffs' motion for a preliminary injunction is denied.

On or before April 14, 2025, the parties are ordered to file a joint letter describing forthcoming

motion practice in this case.  On or before that same date, they are further directed to file an

updated proposed case management plan consistent with ECF No. 22.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
April 5, 2025