UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 ----------------------------------------------------------------X

JOSEPH HARRISON and STEPHEN MAZZA,

                                    Plaintiffs,                    Civil Case No. 24-8619 (HG)

                -against-                                          **SECOND AMENDED
                                                                  COMPLAINT AND JURY
LOCAL ONE, INTERNATIONAL UNION OF                                 <u>DEMAND</u>**
ELEVATOR CONSTRUCTORS OF NEW YORK
AND NEW JERSEY, AFL-CIO; LEONARD
LEGOTTE, in his individual and official capacity as
President-Business Manager of Local One,
International Union of Elevator Constructors of New
York and New Jersey, AFL-CIO; and the
INTERNATIONAL UNION OF ELEVATOR
CONSTRUCTORS,

                                    Defendants.

 ----------------------------------------------------------------X

        Plaintiffs, by their undersigned attorneys, as and for their Second Amended Complaint,

allege as follows:

## <u>INTRODUCTION</u>

        1.      This is an action by two members of Local One, International Union of Elevator

Constructors of New York and New Jersey, AFL-CIO (hereinafter "Local One") addressed to

unlawful retaliatory actions taken by Defendant Leonard Legotte ("Legotte") as President of Local

One, with the support of the parent union, the International Union of Elevator Constructors

("IUEC" or the "International"). Defendants have deprived Plaintiff Harrison of his membership

because he supported a candidate in a union election opposed by Legotte, and Plaintiff Mazza,

Local One's Vice President and Business Agent, has been retaliated against because he supported

that same candidate in an election running against a Legotte-supported candidate, because he

called for an independent investigation of Defendant Legotte for protecting a union officer who assaulted a candidate for office,     and because he was    denied an opportunity by the IUEC to get internal union relief against Legotte's dictatorial actions in the Local.

2.    Plaintiffs seek permanent injunctive relief, damages, and attorneys' fees.

## JURISDICTION

3.    This Court's jurisdiction is invoked pursuant to 29 U.S.C. Section 529 and 29 U.S.C. Section 1331. This Court's pendent jurisdiction is also invoked. Venue is based on the location of the principal defendant, Local One.

## PARTIES

4.    Plaintiff Joseph Harrison ("Harrison") is a member of Local One. Until late April 2023, he was a Vice President and Business Agent for Local One. As set forth below, in June 2024 he was stripped of his membership in Local One. Harrison lives in Huntington, New York.

5.    Plaintiff Stephen Mazza ("Mazza") is a member of Local One. He presently serves and at all relevant times has served as an elected Vice President and Business Agent for Local One. He resides in Smithtown, New York.

6.    Defendant Local One is a local labor organization as that term is defined at 29 U.S.C. Section 402(i), and 29 U.S.C. Section 152(5). Local One has its office located at 47-24 27th Street, Long Island City, New York 11101.

7.    Defendant Leonard Legotte is the President-Business Manager of Local One. He is sued personally and in his official capacity.

8.    Defendant IUEC is a national labor organization, as that term is defined in 29 U.S.C. Section 402(1) and 29 U.S.C. Section 182(5). IUEC has its office at 7154 Columbia Gateway Drive, Columbia, Maryland 21046. It does business within the jurisdiction of this Court.

## FACTS RELEVANT TO ALL CLAIMS

**Retaliation Against Joseph Harrison**

9.      Harrison has been a member of Local One since 1998. In 2022, Harrison was elected as a Vice President of Local One, and in that capacity served as a Business Agent, representing employees in Long Island and Staten Island, resolving matters involving wages, hours and working conditions.

10.     Local One, as a local of IUEC, is governed by its own Constitution (Exhibit S) and the IUEC Constitution (Exhibit A), and is subject to the provisions of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq. As such, it has democratic elections every three years, elections to fill vacancies, and its members cannot be disciplined without notice and a fair hearing.

11.     Defendant Legotte, after serving for approximately six years as a Vice President, was elected President of Local One in June 2007, after a Federal Trusteeship was imposed on Local 1 for corrupt practices.. Legotte, over the years, has become less and less tolerant of other officers who disagree with him or who challenge his decisions. There has been growing dissatisfaction with Legotte's leadership, and the Local's next election, in June 2025, is expected to be contested, with Plaintiff Stephen Mazza running against Legotte.

12.     From April 23, 2023, to April 25, 2023, Plaintiff Harrison attended the National Building Trades Legislative Conference ("NBTLC" or the "Legislative Conference") in Washington, D.C. in his capacity as a Vice President/Business Agent for Local One.

13.     Plaintiff Harrison drank excessively during social events after the NBTLC meetings, and danced one evening in an inappropriate manner with a woman married to the President of another union, while he was intoxicated. He was observed inebriated on other

occasions. Harrison's behavior caused at least one complaint to be made by the President of the union whose wife he had inappropriately danced with.

14.     Alcoholism is a common condition amongst the leadership and staff of Local One. It is customary to give individuals with a drinking problem represented by Local One, and employed by Local One, time off to seek treatment to address their problem, similar to treatment programs for general union members working in construction.

15.     Another Local One Vice President and Business Agent, Thomas Whooley, who also attended the NBTLC, had public incidents arising at social events following the NBLTC arising out of excessive drinking as well. His behavior included falling out of a car in front of other attendees because of his level of intoxication. After the conference he was called by Defendant Legotte and told to park his Union car at the Union Hall and report to the Union Hall for several weeks, and not go out onto worksites. He was also required to attend several Alcoholics Anonymous meetings. He did that without a requirement to provide toxicology reports, and without further penalty.

16.     Harrison, however, found himself in serious trouble. On April 28, 2023, Legotte summoned Harrison to discuss the complaint he had received from the President of the Laborer's Union. Legotte recounted the events referenced above, noted other incidents, and told Harrison that he was an embarrassment to the Union. Legotte gave Harrison two choices: resign from his position as Vice President and Business Agent, or face disciplinary charges. Legotte expressly stated that if Harrison resigned, he would not pursue disciplinary charges. Harrison agreed to resign, with a six-week payout. Local One Secretary Treasurer Michael Rieger witnessed the meeting. Legotte agreed to allow Harrison to speak at the next Local One Membership meeting.

17.    At the June 2023 Local One membership meeting, Harrison read a statement to the members, who were aware of his resignation, and why he had resigned, apologizing for what happened. He opened up about health issues and other personal issues, admitted to making "bad choices." A copy of his speech is attached as Exhibit T.

18.    In or around September 21, 2023, Local One held a contested election for Plaintiff Harrison's former position.

19.    Plaintiff Harrison openly supported Andy Schrettner, a Local One field employee, in the election. Schrettner was running against Richard Loeb, who had the support of Defendant Legotte, who had been appointed by Defendant Legotte to fill Harrison's position on an interim basis before the election. Harrison made his support well known, talking to other employees and campaigning on Schrettner's behalf. Legotte utilized the Union's law firm, Virginia & Ambinder, in an effort to keep Harrison from campaigning; Virginia & Ambinder threatened Harrison's employer for engaging in "employer interference" in the election, alleging that Harrison was working in a supervisory position. Virginia & Ambinder also alleged to the employer that Harrison was campaigning during work time.

20.    Harrison did not keep his support a secret. He went to a few locations where Local One members worked, accompanied by Schrettner. Harrison was not scheduled to work at the time he campaigned. At one location he spoke to a group of 80 members. Harrison later learned that he had been recorded. On the day of that speech Harrison received a text message from Legotte demanding a call.

21.    Andy Schrettner won the election.

22.     On or around October 4, 2023, Legotte filed charges against Harrison accusing him of violating Article XVIII, Section 1, subsections 2, 8, 12, and 15 of the International Union of Elevator Constructor's Constitution and By-Laws. The charges are annexed as Exhibit B.

23.     The charges were not filed with Local One, as per Article XVIII Section IV of the IUEC Constitution, which states: "When charges have been made, the entire matter shall be referred to the Local Executive Board and the Executive Board will try, hear, and determine said charges

24.     On October 31, 2023, IUEC President Frank Christensen appointed Rusty Gilbert and Steve Bruno, two IUEC employees who served, at his pleasure, as Regional Directors, to serve as a Trial Board and hear the charges. See Exhibit C.

25.     That same day, Harrison received notice of the charges by email. See Exhibit D. The email which attached Legotte's charge (Exhibit B) also included a letter indicating who General President Christensen had appointed to serve as the Trial Board (Exhibit C). The email did not include a date for a trial.

26.     On a date unknown to Plaintiff Harrison, someone at the IUEC mailed him notice of a trial date. The notice was not sent out by Registered Mail as required by Article XVIII Section IV of the IUEC Constitution. Plaintiff Harrison did not receive the mailed notice. He also did not receive notice via email. Plaintiff was unaware that a Trial Board hearing was scheduled.

27.     In fact, a hearing was held on December 12, 2023, in New York City. Annexed as Exhibit E is the transcript of the hearing (which was later sent to Plaintiff Harrison) and the Exhibits accepted by the Trial Board. Two witnesses testified at the hearing: Defendant Legotte, who had brought the charges, and IUEC President Christensen, who had appointed the two members of the Trial Board which heard the case.

6

28.    In a decision dated January 9, 2023 (Exhibit F), the Trial Board found Plaintiff guilty of the charges. The Trial Board stripped Harrison of his Union membership, fined him $10,000, prohibited him for running for any Union office or accepting any appointed position for five years and required him to enroll and complete a substance abuse program in order to potentially regain his Union membership.

29.    On or about January 19, 2024, Hearing Officer Gilbert sent Harrison the decision, notifying him of his right to appeal (see Exhibit G).

30.    Plaintiff Harrison was taken by complete surprise when he received the decision. He had no idea that there had been a hearing. On January 29, 2024, he requested the trial transcript and other relevant documents. On January 31, 2024, the trial transcript, the exhibits, the no-harassment policy, and the IUEC Constitution were sent to him (see Exhibit H).

31.    In or around February 2024, Plaintiff Harrison appealed the decision to the General Election Board ("GEB"). See Exhibit I. In that appeal, Harrison

    a.    asserted that whoever sent the notice of the Trial Board date knew that he had not received it since it was sent by Certified Mail. He further noted that the Constitution required service by Registered Mail, which has even more safeguards to ensure the accused receives appropriate notice. No effort was made to contact him, which he alleged (and continues to allege) was a violation of his due process rights; and

    b.    asserted that the charges were politically motivated, and recounted the meeting with Legotte of April 28, 2023, raised how similarly situated officers were treated far more leniently, and argued that Legotte only moved forward with charges in retaliation for his efforts on behalf of a candidate in the vacancy election

for his position, who Legotte was opposed to. He asked for the trial to either be reopened, or the charges dismissed.

32.     On February 19, 2024, Harrison was notified by IUEC Secretary-Treasurer Larry McGann that his appeal would be heard at the Spring Meeting of the IUEC General Executive Board ("GEB"). See Exhibit J. On March 7, Harrison was told that that meeting would occur on April 25, 2024. See Exhibit K.

33.     On April 10, 2024, Harrison requested to present a witness: Local One Secretary-Treasurer Michael Riegger, who, he explained, was present when Legotte assured Harrison he would not bring charges if Plaintiff resigned from his Union position. See Exhibit L.

34.     On April 16, 2024, IUEC Secretary-Treasurer McGann wrote to Plaintiff Harrison and informed him that he would be welcome to appear at the IUEC's GEB meeting and state his case, but that witnesses would not be permitted. See Exhibit M.

35.     Plaintiff appeared before the IUEC GEB on April 25, 2024. He made a presentation following the reasons stated in his appeal letter. He protested the fact that the hearing was not first held (or the charges referred) to the Local Executive Board, and that the General President, who oversaw the whole proceeding and appointed the Trial Board, then served as a witness at the trial. Harrison also went through the events that unfolded with Legotte, how Legotte had agreed not to press charges and explained how the charges were clearly an act of political retaliation. The questions he received from the Board mainly involved his actions at the NLTC, and how and whether he had addressed his alcoholism.

36.     In a decision dated May 20, 2024, the GEB denied Harrison's appeal. See Exhibit N. In that decision the Board focused on Harrison's drinking issue, and did not address the

International's failure to ensure that he had received notice of the trial date. The decision ignored his credible allegations of political retaliations and the bias of his Trial Board.

37.    Subsequent to the Appeal decision, Plaintiff Harrison sought treatment for his alcohol issues. He attended meetings and met regularly with a counselor. After two months, Harrison applied to have his membership reinstated.

38.    In August 2024, in connection with a request for reinstatement, Harrison supplied proof of enrollment to a certified/accredited alcohol recovery program. He was separately informed that the Local One Executive Board had directed him to contact Brendan Loftus, the Director of Local One's Member Assistance Program and a Legotte appointee, to supervise his treatment. In fact, the Executive Board never gave any such direction,

39.    Harrison gave his treatment information to Brendan Loftus. Loftus added a requirement that Harrison be tested weekly, and that the reports had to go to him directly. Harrison did not trust that Loftus would keep his information private and refused to sign a release directed to his treatment program.

40.    To date, despite his participation in an alcohol recovery program, and despite 100% clean toxicology reports, Harrison remains a non-member of Local One. As a result, he is unable to participate in Union affairs in any way. He cannot attend or speak at meetings, nominate candidates for office, vote, or run for office, in the 2025 Union election.

41.    The Union will be having an election in May, 2025. Plaintiff Harrison wished to, at minimum, be able to vote. He also was considering a run for office. Unless his membership is reinstated, he cannot do either. Harrison is wholly willing to pay all membership dues back to the date of his expulsion so that he can be a member in good standing and run for office.

**Retaliation Against Steven Mazza**

42.     Mazza has been a member of Local One since 1998. In 2010 Mazza was elected as a Vice President of Local One, and in that capacity served as a Business Agent, representing members in Local One's jurisdiction resolving matters involving wages, hours and working conditions.

43.     In around early September 2023 Mazza was contacted by a number of Local One members about an incident involving Appointed Organizer Brian Houser. He discovered that Houser had threatened and attempted to intimidate Andrew Schrettner, the candidate running for Joseph Harrison's former position, who Mazza was openly supporting. Mazza was informed that Houser had charged at Schrettner at a bar and restaurant called Bloom's Tavern and assaulted several members when he tried to get to Schrettner. Legotte was present when this occurred. Schrettner filed a Police Report about the incident.

44.     Mazza followed up by writing a letter to Defendant Legotte, on September 11, 2023, demanding that Houser, who was a Legotte appointee, be removed. See Exhibit O. He described Houser's behavior as "unbefitting … [a] position of trust," and violative of the Local and IUEC Constitution, warranting removal.

45.     Defendant Legotte responded by calling Mazza and ordering him to end his investigations. Legotte asked whether Mazza was investigating him, or Richard Loeb, the candidate running against Schrettner. He then threatened that if Mazza's investigation was going to move forward, "Andy [Schrettner] better watch the fuck out." He also warned Mazza that if he continued to pursue the issue, he would be "opening a can of worms" and that he would "go fucking nuclear" on Plaintiff Mazza if his investigation looked into the activities of himself or Richard Loeb. The exact text of the exchange is as follows (L is Legotte and S is Mazza):

L       Listen to me. Steve, shut the fuck up and answer my question. Are YOU investigating ME?

S       I am investigating what happened on Saturday at Bloom's Tavern.

L       No, listen, that's a yes or no, that's a yes or no question. Are you investigating me?

S       I am investigating what happened at Bloom's Tavern.

L       If you are, I'm gonna tell you right now, bro, I'm gonna tell you right now…

S       I am investigating…

L       …you're opening up a fucking can of worms.

S       I am investigating what happened.

L       Listen to me. Shut the fuck up!

S       Ok?

L       You stubborn motherfucker, shut the fuck up! You're talking to me now. You talking to me. You talking to me, bro. If you're investigating me, you're gonna open up a can of worms, bro, I'm telling you right now. Cause I will go fucking nuclear on you. And I'm telling you that.

S       You're going nuclear on me? I'm, I'm getting threatened a lot lately.

L       You investigate me, bro? I'll open up some shit up on you, you will fucking flip out.

S       Len, alright, Len. Like I told you, I'm not, I'm not investigating you, I'm investigating what happened.

L       You better… Dude, I'm telling you right now. I'm telling you right now. Nothing fucking happened. I was there. I saw. You hear me?

S       Len, I hear you. I hear you. I hear you, I'm… So what do I tell the three people who are telling me something different. I'm gonna tell them Lenny was there, Lenny said you, it's your imagination?

46.     Schrettner defeated Defendant Legotte's candidate Richard Loeb in the Vice-Presidential election on September 21, 2023.

47.     On September 28, 2023, Defendant Legotte changed Plaintiff Mazza's area of responsibility from Brooklyn and East Manhattan, which is generally covered by an experienced Business Agent, to Staten Island, the Bronx, and Westchester.

48.     Staten Island, the Bronx, and Westchester are territories generally assigned to new Business Agents. The new area of responsibility is a less prestigious one Mazza considered the move to be a demotion.

49.     On around the same date, Defendant Legotte also removed Plaintiff Mazza as a trustee from the 401(k) and Annuity Plan Board of the Union, a position he had held for 13 years.

50.     No explanation was given for either move. It was not coincidental that these moves occurred one week after Schrettner, who Mazza openly supported and campaigned on behalf of, beat Legotte's candidate in the Vice-Presidential election.

51.     At the October 17, 2023, Union Executive Board meeting, Defendant Legotte, during a discussion about upcoming contract negotiations, stated that he trusted everyone in the room to help with the process, then looked at Mazza, and said "but you!" He then stated to Mazza, "you're done." When Mazza responded, "Is that a threat," Legotte replied "it's a promise." Plaintiff Mazza reported the threat to the NYPD.

52.     One month later, contract negotiations began. All four Vice Presidents customarily attend and participate. Legotte called Mazza and said that if Mazza came, he "would sit with [his] arms folded and not begin talking," until Mazza left.

53.     Plaintiff Mazza was a senior Vice President-Business Agent and was the only Vice President-Business Agent excluded from negotiations by Defendant Legotte. Local One's

Constitution at Article X states that the Vice President shall sit at the side of the President at all times.

54.     In January 2024 Defendant Legotte, at an Executive Board meeting, demanded that Plaintiff Mazza formerly retract his September 11, 2023 letter regarding Houser's conduct at Bloom's Tavern and his request for Houser's removal. When Mazza refused, Legotte asked Mazza to step out of the room. From outside he heard Legotte loudly state, "Fuck him, we may be down to three BA's soon." Mazza re-entered the room, and Legotte attempted to get the Board to censor Mazza and direct him to withdraw his letter demanding that Houser be removed from his position.

55.     The Board refused to hold the vote.

56.     On April 19, 2024, Plaintiff Mazza wrote to Mr. Legotte outlining the above-referenced conduct, asserting that it violated Section 101(a)(2) of the LMRDA, and demanding that Defendant Legotte appoint independent counsel to investigate the political retaliation and workplace harassment. A copy of the April 19 letter is attached hereto as Exhibit P.

57.     In the letter Mazza stated:

> [Y]our string of behavior makes it clear to me that you will likely try to censor me again. Even worse, you may seek to oust me from my position as Vice President-Business Agent
>
> If you are thinking so boldly, I warn you not to try it. The Supreme Court of the United States has made it clear that removing elected union officials based on disagreement with their expressed views about union leadership and policies violates the LMRDA. *See Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 352-55 (1989). This federal law "was the product of congressional concern with widespread abuses of power by union leadership" and was designed "to ensure that unions [are] democratically governed, and responsive to the will of the union membership, as expressed in open, periodic elections." *Id* at 352, 354. Removing me for political disagreement runs afoul of these important principles, and this law.
>
> At the same time, I believe that your retaliatory behavior has already potentially violated the LMRDA. As federal courts around the country have explained, a Union member's free speech rights guaranteed by §101(a)(2)

of the LMRDA are violated if that Union member can show "(l) he or she exercised the right to oppose union policies; (2) he or she was subjected to retaliatory action, and (3) the retaliatory action was a direct result of his [or her] decision to express disagreement with the union's leadership." *Casumpang v. International Longshoremen's & Warehousemen's Union, Local 142,296* F.3d 1042, 1058 (9th Cir. 2001). And as countless other courts have recognized, "criticism regarding Union leadership ... directly relate(s) to Union issues." *Kovach* v. *Turner Dairy Farms, Inc.,* 929 F. Supp. 2d 477, 490 (W.D. Pa. 2013) (citing *Semonick* v. *United Mine Workers of America District No.* 5,466 F.2d 144, 153 (3d Cir. 1972) ("[W]henever **a union member** is to be disciplined for discussing the fitness of union leaders, their policies or their administration, he may claim the protection of the LMRDA's Bill of Rights.").

Everything I have described in this letter up to this point checks each of these three requirements with ease. *First,* in response to my obligation under our Constitution and Bylaws to open an investigation into the alleged behavior of *your* appointed organizer as well as my demand that he be removed for conduct unbefitting of his office—simply put, for expressing my views about our Union's leaders and their behavior—you threatened to "go fucking nuclear on [me]." *Second,* just two weeks after that threat, you subjected me to retaliatory action. You demoted me to oversee a smaller district *that* failed to equate with my years of experience, harming not only me, but our very Union by depriving it of the leadership and experience necessary to negotiate and oversee interactions with the contractors in my former district. If that wasn't enough, you then also removed me from my position on our 401(k) & Annuity Plan Board, a position I cherished and valued for 13 years. You did both by sending me a written letter *without any explanation.* Though it was not in writing, your motivation was clear. It was only made clearer just one month later at our October Board meeting, where you "promise[d]" me that I was "DONE!," and then barred me from participating in our collective bargaining negotiations in November 2023. As the cherry on top, several months later in front of the Executive Board at our January Executive Board meeting, you told the other Board members, "Fuck him, we may be down to 3 BAs soon." You then demanded that I retract my letters regarding Brother Hauser's behavior and demanding his removal, and tried to force the Board to vote to censor me. *Third,* as the timeline of all of these events makes clear, you retaliated against me in direct response to my investigation of *your* appointed organizer and because of my support for a candidate that you opposed.

Your attempt to "order" the democratically elected Board to fall behind your ,,..wants and wishes, free speech rights of all others be damned, failed back in January. But the attempt also should not be allowed to stand without repercussion. Nor should the actual retaliatory actions you have taken against me to date.

Notably, your actions have not only likely violated federal law. They have also violated our own Union's policies and protections. Throughout this period of time, you have countless times berated me with slurs and profanity. I cannot accurately estimate the number of times you have told me to "go fuck myself" or "fuck you" because I was complying with my elected responsibilities or expressing views about certain union leaders that ran counter to yours. You've separately threatened, more concretely, to "go fucking nuclear on me;" emphatically stated in front of the whole board that I was "DONE!," and that you remark was not a "threat," but a "promise;" and stated to the Board ""we may be down to 3 BAs soon" shortly before seeking a vote to censor me. Such behavior clearly constitutes "--[h]arassing conduct," which under our Non-Discrimination and Harassment Policy for Members, includes "'epithets, insults, or negative stereotyping" as ·well as "'threatening, intimidating or hostile acts."

Above all, your conduct has failed to comply with the standards established in Local 1's Constitution and Bylaws. It certainly has failed to accord with your presidential duty to "act to the best of [your] ability." It represents "conduct unbecoming to a member of the Local" and has "unduly impede[d] the work of [an] officer of the Local." And it has failed to "adhere to or comply with the provisions of *this* Constitution and By-Laws."

I believe at this point that I have tolerated your brazen and disrespectful behavior for maintaining opposing political views for far too long. I therefore demand that the Executive Board retain independent counsel to investigate the allegations I have summarized in this letter to whether formal charges should be brought under our own Union's Constitution and Bylaws. I forewarn that I am also currently exploring all state and federal legal relief that I may be entitled to for the retaliatory demotions I have already received to date. I will not accept an internal investigation on this matter, as I believe that the Board will be entirely consumed by an inescapable conflict of interest. I understand that there is precedent for this type of investigation. In 2006,when a harassment complaint was filed against the then Secretary-Treasurer. the Executive Board retained independent counsel to investigate the complaint and *assess* its veracity.

58.    The April 19 letter also accused Legotte of politically retaliating against Plaintiff Harrison, including using Union counsel to try to have Harrison's employer stop Harrison from campaigning for Schrettner, and falsely accusing Harrison of campaigning on company time. Meanwhile other paid officers and clerks for Legotte have campaigned on Union payroll time.

59.     Mazza also accused Legotte of colluding with IUEC President Christensen to engineer a totally unfair trial for Harrison on Legotte's politically motivated charges.

60.     Mazza ended his letter by stating, "Local 1 is not Lenny Legotte's Union. Local 1 does not belong to you. It belongs to our Brothers and Sisters. …I will not watch idly from the sidelines and let such behavior continue any longer."

61.     At the Local One Executive Board meeting on May 1, 2024, Legotte told the Board that no independent counsel was needed. He stated, "You don't need independent counsel, I did it. I admit it. Everything in this letter (Exhibit P) I admit it." He went on to further state that "Harrison does not need [Secretary-Treasurer Mike] Riegger as a witness cause I admit that also." He then proceeded to curse at and threaten Mazza.

62.     On May 28, 2024, Mazza filed charges against Legotte with the IUEC. An annexed copy is as Exhibit Q. Mazza asked IUEC to hear the charges given the politically charged situation at the Local level.

63.     The admission by Legotte was included in the Executive Board's minutes. At a subsequent meeting Legotte demanded a vote of the Executive Board to amend what he said and limit the extent of his admission. Over a divided vote, he prevailed.

64.     On July 15, 2024, IUEC General President Christensen wrote to Mazza (Exhibit R), stating that he "was not aware of circumstances which would warrant the International's involvement."

65.     After that ruling, Mazza withdrew his charges, believing that he could not get a fair hearing in front of the Local Executive Board.

66.     Plaintiff Mazza intends to run against Legotte in Local One's next election, which will occur in May 2025. Given the threats leveled at Executive Board meetings, and to Mazza

personally, as well as the wholly politically motivated and undemocratic expulsion of Joseph Harrison from the Union, it is likely that Legotte will engage in additional threats and take retaliatory actions, that he and his appointed officers, like Houser, will engage in efforts to undermine the election, and intimidate members so as to restrict their right (and Mazza's right) of free speech.

67.    Plaintiff Harrison wishes to be able to vote in that election, and possibly to run for office. Presently, as a non-member, he has no political rights in Local One.

68.    Plaintiffs incorporate by reference each allegation set forth above into the causes of action set forth below.

## AS AND FOR A FIRST CAUSE OF ACTION

69.    By acting as aforedescribed, including the bringing and sustaining of charges against Plaintiff Harrison and bringing about Harrison's loss of membership in the Union, because Harrison supported Schrettner's election, Defendants Local One, Legotte, and IUEC have violated Section 609 of the LMRDA, 29 U.S.C. Sec. 529.

## AS AND FOR A SECOND CAUSE OF ACTION

70.    By acting as aforedescribed, including the bringing and sustaining of charges against Plaintiff Harrison and bringing about Harrison's loss of membership in the Union because he supported Schrettner's election, Defendants Local One, Legotte, and IUEC have violated Section 101(a)(2) of the LMRDA, 29 U.S.C. Sec. 411(a)(2), in part because they retaliated against Harrison for his support of Schrettner, and in part because Harrison's removal is part of a scheme to suppress dissent in Local One.

## AS AND FOR A THIRD CAUSE OF ACTION

71.     By acting as aforedescribed, the IUEC violated the Constitution of IUEC by depriving Plaintiff Harrison of a fair trial in front of his Local Executive Board, as required by the IUEC Constitution and the Local One Constitution absent a showing of prejudice.

## AS AND FOR A FOURTH CAUSE OF ACTION

72.     By acting as aforedescribed, the IUEC violated the Constitution of IUEC depriving Mazza of the right to bring charges in an impartial setting as required by the IUEC Constitution.

## AS AND FOR A FIFTH CAUSE OF ACTION

73.     By acting as aforedescribed, the IUEC has violated Plaintiff Harrison's right to a fair trial as guaranteed by Section101(a)(5) of the LMRDA, 29 U.S.C. Sec.411(a)(5).

## AS AND FOR A SIXTH CAUSE OF ACTION

74.     By acting as aforedescribed, Legotte breached an oral contract with Harrison.

## AS AND FOR A SEVENTH CAUSE OF ACTION

75.     By acting as aforedescribed, including the demotion of Plaintiff Mazza, and removal of Mazza from a Trustee position on the Benefit Funds because he complained about Defendant Legotte's appointee, Houser assault of Schrettner, and because he supported Schrettner's election, Defendants Local One and Legotte have violated Section 609 of the LMRDA, 29 U.S.C. Sec. 529.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

76.     By acting as aforedescribed, and by threatening Plaintiff Mazza because Mazza complained about Defendant Legotte's appointee Houser, supported Schrettner's election,; and by Legotte's use of union resources in the vacancy election, and by Legotte's bringing Harrison up on charges because he supported Schrettner, Defendants Legotte, and Local One, have engaged in

a scheme to suppress dissent which violates, and continues to violate (by chilling members' right of free speech), Section 101(a)(2) of the LMRDA, 29 U.S.C. Sec. 411(a)(2).

## IRREPARABLE INJURY

77.     Should this Court fail to grant the injunctive relief requested by Plaintiffs, Plaintiffs, and the members of IUEC will suffer immediate and irreparable injury in that they will be denied their right to exercise their right of free speech, the right to run for office, and the right to a fair election.

78.     Separately, Harrison's removal from membership, and his inability to attend union meetings, and run for union office, constitutes irreparable injury.

## EXHUSTION OF REMEDIES

79.     There are no additional reasonable internal union remedies which Plaintiffs can exhaust.

## DAMAGES

80.     Plaintiffs Harrison and Mazza have each sustained emotional distress damages, and other compensatory injuries, in a sum which can be determined at trial.

81.     Defendants' above-described actions have been carried out in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages.

## JURY DEMAND

82.     Plaintiffs demand a jury trial on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

1.      Enter Judgement:

     a.     Directing Defendant Legotte to cease all threats against members who engage in oppositional union activity;

     b.     Directing Defendants Local One and IUEC to reverse any actions taken to remove Plaintiff Harrison from membership;

     c.     Directing Defendants Local One and Legotte to reinstate Plaintiff Mazza to his former Business Agent Assignment and his position on the 401k and Annuity Plan Board;

     d.     Directing Defendant Legotte to pay plaintiffs compensatory damages for emotional distress injury;

     e.     Directing Defendant Legotte to pay Plaintiffs punitive damages in the sum of $1 million;

     f.     Awarding Plaintiffs attorney's fees and costs; and

     g.     Granting such other relief as is just and equitable.

Dated: New York, New York
       May 9, 2025

                       ADVOCATES FOR JUSTICE,
                       CHARTERED ATTORNEYS
                       *Attorneys for Plaintiffs*

                       By:     /s/ *Arthur Z. Schwartz*
                             Arthur Z. Schwartz
                              Richard Soto
                     225 Broadway, Suite 1902
                     New York, New York 10007
                     (212) 285-1400
                     aschwartz@afjlaw.com
                     rsoto@advocatesny.com